**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

UNITED STATES OF AMERICA,      )
          )
          Plaintiff,     )
          )
      vs.          )      **Case No. 07-CR-30137-MJR**
          )
KENNETH KIRKLAND,      )
          )
          Defendant.    )

## ORDER

**REAGAN, District Judge:**

### A.  Introduction

On September 19, 2007, Defendant Kirkland was indicted for possession with intent to distribute 50 grams or more of crack-cocaine (Doc. 14).  This case is currently set for trial on Monday, April 28, 2008.

On November 30, 2007, Kirkland filed a motion to suppress evidence (Doc. 27) under the Fourth Amendment and the Illinois Constitution Article I, Section 6.  Specifically, he argues that his initial traffic stop was an unreasonable detention in violation of the Fourth Amendment, that physical evidence was obtained from his vehicle in violation of the Fourth Amendment, and that his statements were obtained in violation of the Fifth Amendment.  He requests that his statements and any physical evidence obtained from his vehicle be suppressed.

The Government filed its response on January 4, 2008 (Doc. 32) and Kirkland filed a reply on February 1, 2008 (Doc. 36).  The Court held a hearing on the motion to suppress on February 28, 2008 (Doc. 40).[1]  At the hearing, the Government presented various witnesses and

---

[1]  At the close of the hearing, the Court ordered the parties to submit memoranda discussing any authority supporting or opposing the Government's proposition that a drug dog's positive alert on a vehicle creates probable cause to initiate a traffic stop and search that vehicle.  The Government filed its

exhibits, including a DVD of the traffic stop (See Doc. 41). Kirkland did not testify at the hearing.

Having fully considered the parties' filings and the evidence presented at the February 28, 2008 hearing, the Court hereby **GRANTS IN PART AND DENIES IN PART** Kirkland's motion to suppress (Doc. 27).

## B. Factual Background

Jason Totel is a police officer in Fairview Heights, Illinois. Totel works with Kohl, a German Shepherd trained in the detection of narcotics. Totel has undergone extensive training with Kohl, including an initial three-week training period in January of 2007. He and Kohl currently participate in monthly training with other officers, and Totel does personal training with Kohl on a weekly basis.

Kohl has been trained in narcotics detection in automobiles and rooms. Totel testified that Kohl is 98.8% accurate in his detection of narcotics.[2] Totel also testified that when Kohl identifies the odor of narcotics, he sits and looks at the location of the drugs if they are above his head, or else he lays down and puts up his ears if they are lower. However, Totel also testified that Kohl sometimes varies slightly from these alert signals, but Totel can generally interpret Kohl's behavior due to their personal training. Totel noted that a positive alert to the presence of narcotics does not necessarily mean that drugs are present, but rather that the odor of narcotics is there. For

_____

memorandum on March 11, 2008 (Doc. 44). However, Kirkland failed to file his memorandum as ordered.

[2] The parties made great efforts to verify the calculation of this statistic. The percentage is derived from the results of 509 controlled training searches and 203 actual searches conducted while on duty. As far as the Court can determine, Kohl's accuracy with respect to the searches on the street is derived from instances where (a) Kohl located drugs, (b) Kohl alerted to the presence of drugs, but none were actually located, (c) Kohl did not alert to the presence of drugs, and none were actually located, or (d) Kohl did not alert to the presence of drugs, but drugs were actually located.

instance, a drug dog might give a positive indication where drugs were present 8-10 days prior to the search.  In any case, whenever Kohl alerts to the presence of drugs, Totel rewards him by giving him a rubber toy known as a "kong."

On September 2, 2007, Totel was on duty when an employee of the Ramada Inn notified him of possible drug activity related to Kirkland.  Totel obtained a criminal history check and was told that Kirkland had a prior felony related to a drug trafficking offense.  Totel then searched the parking lot and identified Kirkland's vehicle, a blue Chevrolet Caprice.

At approximately 4:45 a.m., Totel had Kohl perform a "sniff" of the vehicle.  Starting at the rear passenger side, Totel led Kohl around the vehicle in a counter-clockwise direction.  Kohl indicated the presence of narcotics at the rear passenger side by laying down with his head between his paws and his ears in an upright position.  Kohl also indicated the presence of narcotics near the driver's door by laying down.

At that time, Totel also received information from the Illinois State Police that Kirkland was the subject of an open DEA investigation in Kansas City, Missouri.  Consequently, Totel contacted his commanding officer, Sergeant Origliosso, who told Totel to conduct surveillance of the vehicle.  Totel conducted visual surveillance for approximately two hours and was then replaced by Officer Brian Rogers.

When Rogers began surveillance, he was informed that Kohl had given a positive indication as to the presence of narcotics and that Kirkland had a prior felony.  Sgt. Origliosso directed Rogers to perform surveillance on the vehicle and initiate a traffic stop, if possible, when Kirkland entered the vehicle.

At approximately 9:15 a.m., Kirkland drove the vehicle out of the parking lot and travelled westbound on Interstate 64.  Rogers followed and observed air fresheners dangling from

the rearview mirror, a cracked windshield, and believed that Kirkland was not wearing a seatbelt. Rogers pulled him over for these violations.

Rogers asked Kirkland a variety of questions, including his name, where he was going, where he was from, where he was staying, and why he was in the area. Kirkland stated that he was from Kansas City and was in town to visit his girlfriend, though he could not recall where she lived. Rogers testified that Kirkland's vague answers raised his suspicions that criminal activity was afoot. Additionally, when Kirkland obtained his license and registration, Rogers noticed large sums of cash in the glove compartment, which Kirkland said were earnings from work.

At this time, Rogers' partner, Officer Hester, then began to write warning tickets for the violations. Rogers presented Kirkland with the warnings at the rear of Kirkland's vehicle and then told Kirkland he was free to leave. Approximately 13 minutes had elapsed from the time of the initial stop.

Just as Kirkland turned to leave, Rogers asked, "Mr. Kirkland, before you go, do you mind if I ask you a couple questions?" Kirkland replied, "Go ahead."[3] Rogers then asked Kirkland whether he had any drugs in the car, and Kirkland stated that he did not. Rogers then requested that he be allowed to search the car. Though Kirkland never provided written consent, the DVD shows that he unequivocally consented to the requested search and offered to open the trunk. He also expressly stated that he had no objection to other officers helping with the search.

At this time, Officer Madrusic and Sgt. Origliosso conducted a search of the vehicle while Rogers engaged in "small talk" with Kirkland. Though Kirkland offered to help with the search, Rogers indicated that the officers would do it on their own for safety reasons. At no time

---

[3] The Court has verified the statements attributed to the officers and Defendant by reviewing the DVD of the traffic stop multiple times.

4

did Kirkland attempt to stop or limit the scope of the search, though he did state a concern that the officers not damage his vehicle.  It is clear on the DVD that Kirkland was highly cooperative.

Soon afterwards, the officers located rifle cartridges and a gun magazine in the glove compartment.  Believing that Kirkland had a prior felony conviction, the officers handcuffed Kirkland and placed him under arrest for suspicion of being a felon in possession of ammunition.  Kirkland was not given any *Miranda* warnings at this time.  Kirkland denied that he had a prior felony conviction.  The officers later found more ammunition in the trunk.

The search continued, and Kirkland at no time objected to the search.  Officer Madrusic attempted to open the hood of the trunk, but was unable to do so.  When asked how they could open the trunk, Kirkland stated that while he had owned the car for one year, he had never looked under the hood and did not know how it could be opened.  After further inquiries on this point,[4] Kirkland explained that the hood could be opened by simultaneously using the latch and tapping on the hood.  Soon after receiving this information, the officers were able to open the hood.  The officers then located a sock filled with crack-cocaine hidden inside the air filter compartment.  Kirkland, however, denied knowledge that the crack-cocaine was there.

On September 4, 2007, Officer Mark Rigel interviewed Kirkland.  Kirkland was given his *Miranda* rights, and though he did not execute a written waiver of those rights, he indicated that he was willing to speak with Rigel.  At that time, Kirkland stated that he would accept responsibility for the drugs, because they were located in his vehicle.  However, Kirkland refused to make a formal written statement.

---

[4]  Though additional questioning is not audible on the DVD, one of the officers later indicated that he spoke with Kirkland about the need to explain how to open the hood.  This officer stated, "I told him, I said, 'If you don't tell them how to open that hood,' I said, 'they're gonna rip your shit up.'" **Exh. A, 9:54:35.**

<u>**C. Analysis**</u>

Kirkland raises three challenges in his motion to suppress. First, he argues that the length of his detention was unreasonable, and that he was detained without a reasonable articulable suspicion that he was involved in any criminal activity justifying the detention. As a result, Kirkland argues that the search of his vehicle violated the Fourth Amendment and Article I, Section 6 of the Illinois Constitution. He moves the Court to suppress all evidence gained by virtue of his unlawful detention as fruit of the poisonous tree.

Second, Kirkland argues that the search violated the Fourth Amendment and Article I, Section 6 of the Illinois Constitution because the officers did not obtain a search warrant, Kirkland did not give consent, and the search of the engine compartment was not made incident to his arrest.

Finally, Kirkland argues that any statements he made prior to receiving *Miranda* warnings violated the Fifth Amendment. Thus, he moves the Court to exclude all statements made prior to or after his arrest.

**1. Kirkland's Detention and Arrest**

The Fourth Amendment guarantees the right against unreasonable seizures. Article I, Section 6 of the Illinois constitution imposes the same restrictions as the federal Constitution's Fourth Amendment. ***People v. Caballes*, 851 N.E.2d 26, 46 (Ill. 2006); *People v. Tisler*, 469 N.E.2d 147, 156 (Ill. 1984).**

Kirkland references the standard provided in ***Terry v. Ohio*, 392 U.S. 1 (1968)** and argues that the length of his detention was unreasonable, and that he was detained without a "reasonable articulable suspicion" that he was involved in any criminal activity justifying the detention. Under ***Terry***, "police officers may conduct a brief, investigatory stop of a suspect if they have reasonable suspicion based on articulable facts that a crime is about to be or has been

6

committed." ***United States v. Johnson*, 383 F.3d 538, 542 (7th Cir. 2004).** Reasonable suspicion means an "objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." ***Id.***

Here, Kirkland maintains that, by inquiring about matters beyond the subject of the traffic stop (i.e., Kirkland's girlfriend, his job, and his personal finances), Rogers ran afoul of the rule in ***Terry***. The stop at issue here, however, is not properly analyzed under ***Terry*** because this traffic stop was justified by probable cause.

An officer has probable cause for a traffic stop when he has an "objectively reasonable" basis to believe a traffic law has been violated. ***United States v. Dowthard*, 500 F.3d 567, 569 (7th Cir. 2007) (citing *United States v. McDonald*, 453 F.3d 958, 961-62 (7th Cir. 2006)).** There is no question that Officer Rogers had probable cause that Kirkland was violating at least three traffic laws, as Rogers observed that Kirkland had a cracked windshield, had air fresheners dangling from his rearview mirror, and was not wearing a seatbelt. Clearly, a police officer who has probable cause to believe that a driver has committed a traffic infraction—even a minor one—may initiate a traffic stop, and the officer's subjective motivations for making the stop are irrelevant. ***See Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Brown*, 188 F.3d 860, 864 (7th Cir. 1999); *United States v. Williams*, 106 F.3d 1362, 1365-66 (7th Cir. 1997).** In ***United States v. Bass***, the Seventh Circuit reiterated:

> As a general matter, a police officer's decision to stop a car is reasonable if the officer has reason to believe a traffic violation has occurred....  Any ulterior motive an officer may have for making the stop is irrelevant....  [***quoting Whren*, 517 U.S. at 813**] "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."

**325 F.3d 847, 850 (7th Cir.), *cert. denied*, 540 U.S. 998 (2003).** Thus, the fact that Rogers hoped

to investigate potential drug activity does not diminish the fact that he had probable cause to make the stop due to Kirkland's traffic violations.

Moreover, a well-trained drug dog's positive alert creates probable cause to conduct a search. **United States v. Martin, 422 F.3d 597, 602 (7th Cir. 2005);** *see **United States v. Hernandez**,* **24 Fed.Appx. 560, 562 (7th Cir. 2001) ("A dog's alert alone supplies probable cause that drugs are present.").** It is well-established that "[a] vehicle may be stopped and searched without a warrant if there is probable cause to believe the vehicle contains contraband or other evidence of illegal activity." **United States v. Navarro, 90 F.3d 1245, 1252 (7th Cir. 1996).** Here, Kohl gave a positive alert as to the presence of narcotics in the vehicle, and Officer Rogers was aware of this fact. Kohl is a well-trained drug dog, as the testimony indicated that he had a 98% accuracy rating. After the positive alert, the car remained under visual surveillance up until the time Kirkland was actually pulled over. Thus, even without the traffic violations, Kohl's indication that the vehicle contained narcotics provided the officers with probable cause to stop Kirkland's vehicle.

The Seventh Circuit has noted that traffic stops based on probable cause are themselves arrests. **United States v. Garcia, 376 F.3d 648, 651 (7th Cir. 2004);** **United States v. Childs, 277 F.3d 947, 953 (7th Cir. 2002);** *see also **United States v. Rankins**,* **2004 WL 2486900, *3 (7th Cir. 2004) (unpublished).** Though arrested persons, unlike those stopped based on reasonable suspicion, "need not be released as soon as possible," the Fourth Amendment still requires that the seizure remain reasonable. **Childs, 277 F.3d at 952.**

> Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention. They do not signal or facilitate oppressive police tactics that may burden the public—for all suspects (even the guilty ones) may protect themselves fully by declining to answer. Nor do the questions forcibly invade any privacy interest or extract information

without the suspects' consent.

*Id.* **at 954.**

Here, approximately 13 minutes passed from the time Kirkland was pulled over until the time he was issued warning citations—a relatively short amount of time and typical for a traffic stop. Having viewed the DVD of the traffic stop, the Court cannot discern any question or action by the officers that unreasonably delayed the stop. Additionally, the questions asked of Kirkland with regard to his reasons for being in the area and the basis for having such a large amount of cash on hand did in fact hold the potential for detecting other crimes, and they created little inconvenience, if any. Indeed, most of these questions occurred after Kirkland had been given permission to leave but then consented to engage in further conversation with Rogers.

Additionally, after a ticket or written warning is issued and the driver is told he can leave, a further attempt to seek information from a driver, as occurred here, "does not render this second phase of questions a new seizure." *United States v. Figueroa-Espana*, **511 F.3d 696, 702 (7th Cir. 2007) (citing** *United States v. Rivera*, **906 F.2d 319, 322-23 (7th Cir. 1990)).** However, a subsequent consensual encounter between the officer and the driver is not within the ambit of Fourth Amendment scrutiny. *Id.* Here, it is clear that Kirkland was informed that he was free to leave and then voluntarily consented to further questioning. As noted above, Rogers asked, "Mr. Kirkland, before you go, do you mind if I ask you a couple questions?" to which Kirkland replied, "Go ahead." Review of the DVD clearly shows that Kirkland was cooperative and did not object to further conversation. As a result, this subsequent consensual encounter is not an unconstitutional "seizure" within the context of the Fourth Amendment.

Accordingly, the Court **DENIES** the motion to suppress evidence recovered from Kirkland's vehicle as to these grounds because the detention was supported by probable cause, was

not unreasonably lengthy, and was followed by an additional consensual encounter.

## 2. The Search of Kirkland's Vehicle

The Fourth Amendment also guarantees the right against unreasonable searches. Article I, Section 6 of the Illinois constitution imposes the same restrictions as the federal Constitution's Fourth Amendment. ***Caballes***, **851 N.E.2d at 46;** ***People v. Tisler***, **469 N.E.2d at 156.**

Kirkland argues that the search of his vehicle was unconstitutional because it was conducted without a warrant, without his consent, and not as a valid search incident to arrest. However, under the automobile exception, a warrantless search of a vehicle does not violate the Fourth Amendment where probable cause to believe that the vehicle contains contraband or evidence of illegal activity exists. ***United States v. Washburn***, **383 F.3d 638, 641 (7th Cir. 2004).** Additionally, a well-trained drug dog's positive alert creates probable cause to conduct a search. ***Martin***, **422 F.3d at 602;** *see Navarro*, **90 F.3d 1245, 1252 (7th Cir. 1996) ("A vehicle may be stopped and searched without a warrant if there is probable cause to believe the vehicle contains contraband or other evidence of illegal activity.");** ***Hernandez***, **24 Fed.Appx. at 562 ("A dog's alert alone supplies probable cause that drugs are present.").** As explained above, the officers had probable cause to search Kirkland's vehicle because Kohl had given a positive alert as to the presence of narcotics. Therefore, a warrant was not required to conduct the search.

Irrespective of probable cause, however, voluntary consent to search a vehicle renders the search reasonable under the Fourth Amendment. ***Schneckloth v. Bustamonte***, **412 U.S. 218, 219 (1973).** Kirkland clearly gave consent to the search here. After he was told he could leave, he voluntarily agreed to engage in further consensual conversation with Rogers. Rogers immediately

asked for permission to search the vehicle for drugs, and Kirkland readily consented to the search, even offering to help the officers by opening the trunk. Kirkland also expressly consented to Rogers' request that other officers participate in the search. When consent was given, Kirkland was not under arrest and had previously been told that he was free to leave. Though Kirkland did not give express consent for the officers to search under the hood of the car, he never attempted to limit the scope of the search, nor did he request that the officers stop the search. Additionally, Kirkland did not object when it was clear that the officers intended to look under the hood of his car. As such, the Court finds that Kirkland's consent rendered the search reasonable under the Fourth Amendment.[5]

As Kirkland expressly and voluntarily consented to the search, and the officers had probable cause to conduct a warrantless search, the Court **DENIES** Kirkland's motion to suppress the physical evidence collected from the vehicle.

### 3. Kirkland's Statements

Finally, Kirkland argues that the statements he made prior to and after his arrest were in violation of *Miranda* and should be suppressed. However, in his motion, Kirkland does not specify which particular statements were unconstitutionally obtained, and this Court "need not try to fish a gold coin from a bucket of mud" in determining which specific statements Kirkland intends to challenge. *United States ex rel. Garst v. Lockheed-Martin Corp.*, **328 F.3d 374, 378 (7th Cir.**

---

[5] The Government also argues that the search was justified as an inventory search. "Warrantless inventory searches of vehicles are lawful if conducted pursuant to standard police procedures aimed at protecting the owner's property—and protecting the police from the owner's charging them with having stolen, lost, or damaged his property." *United States v. Pittman*, **411 F.3d 813, 817 (7th Cir. 2005).** Because the Court finds both than Kirkland consented to the search and that the search was supported by probable cause, the Court need not reach the question of whether a valid inventory search occurred.

**2003).** Nonetheless, at the hearing, Kirkland referred specifically to statements he made at the scene explaining how to open the hood as well as the September 4, 2007 statement he made to Officer Rigel.

The Fifth Amendment provides that "No person . . . shall be compelled in any criminal case to be a witness against himself." In order to protect a suspect's Fifth Amendment privilege against self-incrimination, *Miranda* warnings must be given to suspects prior to custodial interrogation. ***Miranda v. Arizona*, 384 U.S. 436 (1966).** Where officers fail to give such warnings, the suspect's responses cannot be introduced as evidence of guilt. ***See Berkemer v. McCarty*, 468 U.S. 420, 429 (1984) (discussing the extent of *Miranda*'s protections).**

With respect to Kirkland's statements to Officer Rigel on September 4, 2007, it is undisputed that Kirkland received *Miranda* warnings. Despite being informed of his rights, Kirkland indicated that he was willing to speak with Rigel and then stated that he accepted responsibility for the drugs because they were located in his car. The Court finds no constitutional deprivation with respect to this statement, because after *Miranda* warnings are issued, incriminating statements may be used against a suspect who voluntarily waives those rights. ***United States v. Murdock*, 491 F.3d 694, 700 (7th Cir. 2007).** Here, Kirkland orally waived his privilege against self-incrimination by unequivocally agreeing to speak with Rigel. Thereafter, he made the incriminating statement.

Kirkland argues that the statement was not voluntary because he was still in his civilian clothes two days after he had been taken into custody. Additionally, Kirkland notes that he gave the statement to Officer Rigel while Sgt. Origliosso was in the interview room, which was approximately 10' x 10' and included a table with four chairs. Kirkland argues that this atmosphere was coercive. He also argues that the lack of a written waiver suggests that his statement was not

voluntarily given.

However, these factors without more do not indicate that Kirkland's statement was involuntary or coerced. The interview was relatively short, and Kirkland immediately agreed to waive his *Miranda* rights. He told Officer Rigel that he would accept responsibility, that he would just "lay down [his] head and do [his] time," and that he did not wish to make a written statement. The testimony indicated that this was the full extent of the conversation, and there are no other factors which would indicate that the statement was coerced. As a result, the statement made to Rigel on September 4, 2007 did not violate Kirkland's Fifth Amendment rights and will not be suppressed.

Kirkland's challenge with respect to statements made at the scene are not as easily resolved, however. The first question is whether Kirkland was in custody at the time he made the statements. The Supreme Court has held that persons detained in routine traffic stops are not "in custody" for the purposes of *Miranda*. *Id.* **at 440.** However, a suspect is certainly in "custody" after formal arrest. *See id.* **at 434.** As explained above, Kirkland had been told that he was free to leave, but agreed to engage in further conversation with the police officers. Kirkland also permitted the officers to search his vehicle. He was clearly not in custody for the purposes of *Miranda* at this time, as he only remained on the scene pursuant to his express consent to the conversation and search. As such, no *Miranda* warnings were required at this time, and none were given. Thus, none of the statements prior to Kirkland's formal arrest were obtained in violation of his Fifth Amendment rights.

Kirkland was not placed under formal arrest until after the officers found ammunition in his vehicle. At that point, Rogers placed Kirkland in handcuffs and specifically told him that he was under arrest. Thereafter, Kirkland was in custody. This fact required that the officers give

Kirkland the *Miranda* warnings prior to any interrogation. However, not all statements made by police are considered interrogation. "'Interrogation' refers to 'express questioning' as well as 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" ***United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980)).** The issue here is whether the statements in question were made in response to police interrogation.

The DVD makes it clear that Kirkland was not given *Miranda* warnings upon his arrest or at any time while he remained at the scene. At this time, the officers asked Kirkland how to open the hood of the vehicle, and he initially responded that he had never opened the hood and did not know how. Though the DVD does not include any further audible questions directed toward Kirkland on this matter, one officer stated that he continued to discuss the issue with Kirkland. In the officer's own words, "I told him, I said, 'If you don't tell them how to open that hood,' I said, 'they're gonna rip your shit up.'" **Exh. A, 9:54:35.** Kirkland then explained that the hood could only be opened by simultaneously pulling the latch and tapping on the hood of the car.

At the hearing, Kirkland's counsel argued that the statement was in response to an illegal interrogation. This Court agrees. As explained above, an officer's question constitutes interrogation where it is "reasonably likely to elicit an incriminating response from the suspect." ***Hendrix*, 509 F.3d at 374 (7th Cir. 2007).** The officers' testimony made it clear that while at the scene, they believed that drugs were hidden under the hood of the vehicle but that it was difficult to open the hood. In light of this, the officers should have known that continued questioning was reasonably likely to elicit an incriminating response, because a positive answer would establish that (1) Kirkland had knowledge of the trick that could open the hood, and (2) that Kirkland had access

to the area in which the drugs were actually located. The Court finds that the questioning as to whether Kirkland knew how to open the hood constitutes interrogation, and because the officers failed to inform Kirkland of his *Miranda* rights, his statements in response to the interrogation must be suppressed.

The Government argues that the officers were not interrogating Kirkland, but were instead asking for assistance in opening the hood so as to prevent damage to the car. The Government also argues that such inquiries constitute general on-the-scene questioning, which is permissible under *Miranda*. In support of its position, the Government cites a Tenth Circuit opinion, *United States v. McCurdy*, **40 F.3d 1111, 1118 (10th Cir. 1994).** *McCurdy* is neither controlling nor on point. There, the Court addressed the question of whether inadmissible statements made in response to pre-*Miranda* questioning also rendered post-*Miranda* statements inadmissible. The Court determined that the post-*Miranda* statements were admissible under the circumstances. *Id.* **at 1118.** The constitutionality of the officers' pre-*Miranda* questioning was not in issue. Accordingly, the Tenth Circuit's holding is irrelevant as to the statements at the scene here, which were all pre-*Miranda*.

The court also stated that "[a]n officer's request to search a defendant's automobile does not constitute interrogation invoking a defendant's *Miranda* rights." *Id.* **at 1118.** The Court found that whether the physical evidence should be suppressed therefore turned solely on whether the defendant voluntarily consented to the search of his truck. As stated above, it is clear that Rogers' initial request to search Kirkland's vehicle is not subject to *Miranda*, because Kirkland was not in custody at the time. However, what is at issue here is whether the officers' continued questioning about how to open the hood constitutes interrogation—not whether the initial request to search constitutes interrogation.

Finally, Kirkland requests that the physical evidence be suppressed as fruit of the poisonous tree under ***Wong Sun v. United States***, **371 U.S. 471 (1963)** because the officers were only able to obtain it after Kirkland told them how to open the hood. However, the suppression of Kirkland's statements about how to open the hood does not require the suppression of the physical evidence located therein. First, the search itself was supported by probable cause, as explained above. Also, Kirkland consented to a full search of the vehicle and never withdrew consent or limited its scope. Consequently, the crack-ccaine was located pursuant to a valid consent-search. Additionally, the inevitable discovery doctrine exception to the exclusionary rule "permits the introduction of evidence that eventually would have been located had there been no [constitutional error]." ***United States v. Jones***, **72 F.3d 1324, 1330 (7th Cir. 1995).** The Government has established by a preponderance of the evidence that the officers intended to search under the hood pursuant to Kirkland's consent, and that they also intended to search there pursuant to an inventory search. Had there not been heightened suspicion of contraband due to Kohl's alert, the Court may have reached a different conclusion under the inevitable discovery rule. However, given the previous alert by Kohl and the officers' stated intent to search under the hood in order to locate the suspected narcotics, the Court finds that the physical evidence would have been discovered inevitably, and therefore shall not be suppressed.

As a result, the Court **GRANTS** the motion to suppress Kirkland's statements with respect to whether he had knowledge about how to open the vehicle's hood, **DENIES** the motion to suppress the physical evidence as fruit of the poisonous tree, and **DENIES** the motion to suppress any of Kirkland's other statements.

### D.  Conclusion

Accordingly, the Court hereby **GRANTS IN PART AND DENIES IN PART** Kirkland's motion

to suppress (Doc. 27).  The motion is **GRANTED** insofar as the Court **EXCLUDES** Kirkland's

post-arrest statements at the scene regarding whether he knew how to open the hood of the vehicle.

The motion is **DENIED** in all other respects.

**IT IS SO ORDERED.**

**DATED this 15th day of April 2008.**

**s/ Michael J. Reagan**
**MICHAEL J. REAGAN**
**United States District Judge**